372

George H. SCHERR, an Individual,
Plaintiff,

v.

NATIONAL BIO-TEST, INC., a corporation, Defendant.

Civ. No. 0436.

United States District Court
D. Nebraska.

March 10, 1961.

Howard T. Markey, of Parker & Carter, Chicago, Ill. (Young, Holm & Miller, Omaha, Neb., of counsel), for plaintiff.

Arthur Raisch, Detroit, Mich. (McCowan & Troia, Omaha, Neb., of counsel), for defendant.

ROBINSON, Chief Judge.

This action is for infringement of claims 1, 3, 4, 6, and 8 of Letters Patent No. 2,787,581 (now Re 24,557), issued to plaintiff, George M. Scherr, on April 2, 1957, and entitled "Means for Assessing the Effect of Various Agents on the Growth of Microorganisms".

The plaintiff is a resident of Cook County, Illinois, and the defendant is a Nebraska corporation with its offices and principal place of business at Omaha, Nebraska.

The patent in suit and the alleged infringing devices relate to a device for use in assessing the activity of chemical agents comprising a flat sheet of absorbent material such as blotting paper having two or more spaced areas impregnated with the chemical agents to be tested. The principal use of the patented device is in testing the sensitivity of bacteria to two or more antibiotics.

Sensitivity testing is a procedure widely used today in clinics, hospitals and research laboratories for determining the susceptibility of disease microorganisms to antibiotics and other chemotherapeutic agents. From a sensitivity test, a physician is able to determine whether an antibiotic will or will not inhibit the growth of a given disease microorganism. This information then aids the physician in deciding which drug to prescribe to the patient from whom the disease microorganism was taken.

In the usual procedure a specimen which has been taken from a patient is streaked over the surface of a growth medium. The growth medium, which may be a solution of blood agar and water hardened to a jello-like consistency in a standard round petrie dish, stimulates growth of the disease microorganism. After the specimen has been streaked over the surface of the growth medium, a device carrying an antibiotic or antibiotics which will inhibit the growth of the disease are placed on the specimen. After the antibiotic-carrying device is placed on the specimen, the dish is sealed

and placed in an incubator for from 12 to 24 hours. The incubator is kept at a temperature closely equivalent to the temperature of the human body so as to reproduce the conditions the disease microorganism normally encounters.

If the antibiotic in contact with the microorganism has no effect on the microorganism, the microorganism will grow right up to the antibiotic-carrying device. However, if the antibiotic has the property of destroying or retarding the growth of the disease microorganism, the growth medium will be unclouded about the device. This unclouded area is designated a "zone of inhibition". By merely examining the petrie dish after a period of incubation, the worker in the art can decide, by noting the presence or absence of the zone of inhibition, whether the disease microorganism is resistant or sensitive to the antibiotic being tested.

During the past decade the number of antibiotics in chemical use has increased and in the early 1950's there was an upsurge in the antibiotic disc field. In testing a culture from a patient to ascertain which antibiotic would be most effective in destroying the bacteria causing the infection, it is necessary to test more than one antibiotic and consequently use more than one sensitivity disc in each test because each individual disc carries only one antibiotic.

In 1954 Doctor Scherr conceived the idea of an integral sensitivity testing disc having a plurality of impregnated extensions or a multiple tipped disc. By aggregating two or more of the sensitivity discs into one unit, the laboratory technician as a matter of convenience would only have to handle one device comprising two or more sensitivity discs instead of handling two or more discs individually. Doctor Scherr combined the sensitivity discs in the form of a star made from the same material as the prior individual sensitivity discs with each of the projecting arms of the star impregnated with a different antibiotic. However, with respect to the multiple disc, the Scherr patent states: "In use, the procedure for handling the specimen does not differ from that described * * * for simple circular paper discs impregnated with a single antibiotic". The expert testimony at the trial was that there is no information obtained by testing with multiple arm sensitivity discs that cannot be obtained with individual discs.

For 15 to 20 years prior to the Scherr patent, the antibiotics were placed on the specimen by several methods:

In the Oxford cup method a small hollow metal cylinder filled with a liquid solution of the antibiotic was placed on the growth medium. For each antibiotic to be tested, a separate cylinder had to be placed on the plate at an appropriately spaced distance from its neighbors, and each individual cylinder filled with the antibiotic solution.

Other methods, such as the tube dilution method and the Trench method were also known. In the mid-1940's the disc method was developed.

The original disc was a tablet or pellet of the antibiotic in compressed, granulated form having a shape similar to the common aspirin tablet. In 1947 a wet paper sensitivity disc was developed by Vincent & Vincent. These scientists completely saturated circular discs of blotting or filter paper with a solution of liquid antibiotic and then placed the wet disc on a specimen. A little later, dried paper discs were utilized.

Plaintiff demonstrated in open court sensitivity tests employing the conventional dried circular discs and also employing the device of the patent, the latter test requiring approximately ⅓ the time of the former.

The claims in issue here are as follows:

"1. For use in assessing the activity of chemical agents in relation to microorganisms, an essentially flat sheet of absorbent material, said sheet having a central area and a plurality of radially extending arms spaced about the periphery of said central areas, the outer terminal areas of said arms being impregnated with different chemical com-

pounds having activity in relation to microorganisms."

"3. For use in assessing the activity of chemical agents a plurality of substantially flat, generally curved disk-like areas of absorbent material, said areas being spaced one from the other and joined one to the other by additional areas of the same material, said first named areas projecting radially from said additional areas and being impregnated with chemical agents.

"4. A testing device for use in assessing (pre-determined properties of chemical agents) the activity of chemical agents in relation to microorganisms, said testing device comprising a member formed entirely of an absorbent material, said member having chemical agent-carrying portions being joined by integral portions of the same material and of the same thickness."

"6. A testing device for use in testing substances which comprises an essentially flat, integral piece of absorbent material having a plurality of peninsular areas individually impregnated with said substances."

"8. Means useable in the determination of the activity of antibiotic substances in relation to microorganisms, comprising an essentially flat piece of absorbent material having a plurality of laterally extending integral portions, said portions being spaced one from the other on said piece and extending from an edge of said piece, said portions individually carrying, at the outer free end thereof, said antibiotic substances."

The problem of handling large numbers of individual items is a problem that is present in every day life and the solution has always been the same; namely, the handling in multiple of items otherwise handled individually. This problem has manifested itself many times in scientific and medical laboratories and has always been solved in the same man-

ner. A brief history of the prior patented and published art shows the handling of items consisting of areas of chemically impregnated absorbent material in multiple which had been handled individually.

Dieterich 691,249 describes a chemical testing litmus paper for making two or more chemical tests at one time. Blue litmus paper is sensitive to acid and when it is immersed in a solution, if the blue turns to red, this indicates that the solution is acid. The red litmus paper is sensitive to alkali and when the red strip of litmus paper is dipped in a solution, if it turns blue, this indicates the solution is alkaline. The Dieterich patent teaches that in testing a solution to determine whether it is alkaline or acid, it was common practice to use two strips of litmus paper, one red and one blue. The person conducting the test first immersed a strip of red litmus paper in the solution, then a blue strip of litmus paper. Dieterich solved the problem of the two strips of paper and the duplicate handling by combining the blue and red litmus paper on strips into one unit. Dieterich's multiple blue and red litmus paper is also a testing device useful for assessing the properties of chemical agents. Thus, by immersing in the solution being tested this single sheet of absorbent paper containing spaced areas, one area sensitive to alkali and the other sensitive to acid, Dieterich accomplished in one operation what was previously accomplished by at least two operations.

Fulweiler 1,512,893 shows a strip of filter paper 15 containing six circular spots each impregnated with one of six different chemical compounds. Each of these compounds is sensitive in a different manner to hydrogen sulphide and each compound will change color depending upon the concentration of the hydrogen sulphide. Thus, by subjecting this strip impregnated with six different spaced spots of chemical compounds to illuminating gas, the strip will indicate in one operation the concentration of hydrogen sulphide in the illuminating gas. By using one strip of the paper

with six spaced areas with different testing compounds thereon, Fulweiler is able to accomplish in one step that which would otherwise be accomplished by six independent strips of paper each containing a single testing compound thereon.

Berman et al. 2,118,144, shows a temperature indicating device used in microbiological and bacteriological laboratories to determine whether or not items treated in sterilizers have been subjected to heat of the proper temperature necessary to destroy the bacteria. Berman's temperature indicator consists of a paper strip 5 imprinted in one area indicated 6 with a chemical compound of litharge and sulphur ink and in another area 7 with a compound consisting of lead carbonate and sulphur ink. Compound 6 has a critical temperature of 230 degrees. Compound 7 had a critical temperature of 250 degrees. Compound 6 is initially yellow and compound 7 is initially white. In use the indicator is inserted in a bundle of articles to be sterilized. The bundle is placed in the sterilizer and treated. If a temperature of 250 degrees has been reached and maintained for a sufficient length of time, both portions 6 and 7 will be black. Thus, by the use of a single indicating device Berman is able to ascertain whether or not a proper sterilizing temperature has been attained and maintained for a proper length of time.

McClintock 2,314,548 is concerned with a method for testing urine for albumin. If there is any albumin present in urine, sulphosalicylic acid when added to the urine will coagulate the albumin so as to form a visible precipitae. The extent of the albumin cloud in the solution will give an approximate indication of the amount of the albumin in the urine. For accomplishing this test McClintock utilizes an ordinary filter paper having separate or spaced areas impregnated with different chemicals. McClintock dips an edge of a circular absorbent filter paper into a solution of sulphosalicylic acid and ammonia until less than one-half of the circular filter paper is impregnated therewith. He then inverts the circular paper and dips the other edge in a solution of tartaric acid until less than one-half the paper is impregnated with tartaric acid. The similarity between McClintock's method in impregnating the filter paper and that used by plaintiff in impregnating its multiple arm discs is striking. Like plaintiff, McClintock fashions several packages of filter paper together and treats them as a unit, by first immersing one peripheral area of the bundle of discs in the chemical solution and then inverting the bundle and immersing an opposite peripheral edge of the bundle of discs in another solution, taking care so that the two areas impregnated with different chemicals are always spaced by an untreated zone. Regarding this untreated zone, McClintock states:

"It is a further object of my invention to dip the paper in the neutralized and weak acid solution in such a way as to prevent overlapping of the differently treated parts of the paper."

"As before, the latter acid will creep along the paper but will not reach the previously dipped part unless it has been dipped too deeply into the tartaric acids. Overlapping is thus avoided and the paper can be kept for months without deterioration".

The impregnated areas are joined together by an area of the same material or filter paper and the two impregnated areas project radially from the unimpregnated central area. When the urine dissolves the chemicals on the paper and the tartaric acid takes the ammonia from the ammonium sulphosalicylic acid so that the sulphosalicylic acid can precipitate any albumin from the urine which passes through the paper. McClintock's device is thus a time and labor saver.

Vollmer 2,190,745 is concerned with a patch test strip for making allergy tests. Vollmer shows an adhesive strip provided with numerous spaced patches of absorbent material such as filter paper, each impregnated with a different allergy testing substance or allergens such as egg,

flour, tomato, etc. In use the strip with all of these spaced patches of different test substances is applied as a unit to the skin of the person being tested. Vollmer states:

"The patches desirably extend from end to end of the strip so the reactions may be read off without removal of the strip from the skin inasmuch as the hypersensitive reaction of the skin which manifests itself in the form of redness and swelling generally extends beyond the contacting surfaces of skin and allergen."

Thus, the zone of skin reaction to the allergen can be read while the multiple patch strip is still applied to the patient's skin. By handling a plurality or multiple of allegrens in one test strip, Vollmer obviates the need for handling each allergen individually on a separate patch or sheet of filter paper.

Vollmer is concerned with testing the sensitivity of a human being to different chemical substances. The plaintiff's device is concerned with testing the sensitivity of bacteria to certain chemical substances. Both relate to hospital laboratory techniques or methods and both Vollmer's and plaintiff's devices serve to bring the substance being tested to the point or place of testing.

The "Canadian Journal of Public Health", December, 1953, at page 468, in a paper entitled "The Filter Paper" Method for Collecting and Transporting Stools to the Laboratory for Enteric Bacteriological Examination", by W. R. Bailey and E. T. Boyne, show a simple method of collecting and handling different specimens of faecal material by the use of a single strip of filter paper which is folded back upon itself. Thus by a single folded strip of filter paper one is able to handle a number of faecal specimens with the same time and labor as would be expended in handling a single faecal specimen.

The Goetz patent, 2,672,432, is also in the direct field of microbiology and is classified in the Patent Office Class 195,

the same class in which plaintiff's patent is found. Goetz shows a device for making microbiological assays. In figures 6 and 7 there is shown a selector membrane 10 which has imprinted thereon, "Inhibitors A, B, C". Penicillin and other chemotherapeutic agents are inhibitors for inhibiting bacterial growth and this membrane 10 with its three quadrants of inhibitors A, B and C is used in making a microbiological assay for the purpose of inhibiting the growth of different microorganisms. Thus Goetz demonstrates that in the field of microbiology it is common practice to handle in multiple a plurality of antibiotics on a single membrane instead of handling each antibiotic individually on separate membranes.

The rule is well established that it is the claim and not the specification which measures the grant to the patentee. Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 276, 277, 69 S.Ct. 535, 93 L.Ed. 672; Altoona Public Theatres v. American Triergon, 294 U.S. 477, 487, 55 S.Ct. 455, 79 L.Ed. 1005; Davies-Young Soap Co. v. Nu-Pro Manufacturing Co., 8 Cir., 273 F.2d 454, 456. The plaintiff's claims in suit in substance are directed to a testing device which combines into one sheet of absorbent material a plurality of areas impregnated with chemical agents to be tested. Such device was well known in the art. The Court finds that the claims in plaintiff's patent are clear and unambiguous and read directly on the prior art and therefore are void.

The law as announced in Gardner v. Buxton, Inc., 8 Cir., 150 F.2d 242, is controlling. In that case, Chief Judge Johnsen writing for the Court, at page 243, held:

"But the mere application of a common expedient to an ordinary use in another art, especially where it has not been clearly demonstrated that a recognized problem has existed in the immediate field and has defied previous solution, is not generally invention. * * * The Supreme Court has only recently again em-

phasized that 'He who is merely the first to utilize the existing fund of public knowledge for new and obvious purposes must be satisfied with whatever fame, personal satisfaction or commercial success he may be able to achieve. Patent monopolies, with all their significant economic and social consequences, are not reserved for those who contribute so insubstantially to that fund of public knowledge.' Dow Chemical Co. v. Halliburton Oil Well Cementing Co., [324 U.S. 320] 65 S.Ct. 647, 650 [89 L.Ed. 973]."

In the case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147–158, 71 S.Ct. 127, 130, 95 L.Ed. 162, the Supreme Court quoted with approval from Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008, as follows:

"The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention."

In this connection the Court in the present case questioned plaintiff's expert, Dr. Henry D. Isenberg, as follows:

"By the Court: In the last analysis, any of these multiple discs that have been exhibited to the Court, is it a fair statement to any that what it amounts to is taking a number of single discs and finding a method of tying them together in a certain spot?

"The Witness: I think there are a few little things that enter into it in addition. I think that the spacing is important.

"By the Court: True, there is the spacing, but it is still a matter of tying them together at proper intervals or spacing, isn't that true?

"The Witness: This describes the disc, yes."

Under the rule announced by the Supreme Court in the A. & P. case, the aggregating or combining of two or more individual sensitivity discs into a unit is patentable only if each of the joined discs in the multiple disc performs a new or different function or operation than that theretofore performed by each disc individually and, in addition, the unification of these individual discs must produce an unusual or surprising consequence. The Court does not find this to be the fact with plaintiff's device. See and compare Long v. Arkansas Foundry Company, 8 Cir., 247 F.2d 366, 370; Briggs & Stratton Corporation v. Clinton Machine Co., 8 Cir., 247 F.2d 397, 400–401; John Blue Co. v. Dempster Mill Mfg. Co., 8 Cir., 275 F.2d 668, 672–673, wherein the Court held: " * * * The mere aggregation of these components which in the aggregation perform or produce no new or different function or operation than that therefore performed or produced by them is not patentable invention."

Plaintiff's multiple disc did not fill any long-felt want which those skilled in the art had been unable to fill and it did not solve any problem which had long baffled solution. There is no basis for concluding that plaintiff did anything more than the work of one skilled in the art and this, it is well settled, is not invention. When the need for a multiple disc arose because of the time and labor involved in the use of individual sensitivity discs, the solution was obvious to one skilled in the art at the time it was first made by the plaintiff, and could reasonably have been expected to occur in the art when the commercial desirability for such a multiple disc provided the incentive for one skilled in the art. Minneapolis-Moline Co. v. Massey-Harris Co., 8 Cir., 208 F.2d 73, 75.

It is the conclusion of the Court that plaintiff's device teaches only what was previously known in the art; that it does not produce an unusual or surprising consequence; that it is anticipated by the prior art; and that it does not meet the

standard of invention required by the Patent Statute, 35 U.S.C.A. § 1 et seq. In view of the foregoing the Court finds that plaintiff's patent in suit is void for want of invention. Plaintiff's complaint should be dismissed and judgment on the merits entered for the defendant, costs to be taxed to the plaintiff.

Counsel for the defendant will prepare Findings of Fact and Conclusions of Law together with an Order for Judgment, present them to counsel for plaintiff for approval as to form only, and submit them to the Court for filing within 30 days from date hereof.